IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**CHERYL DENISE SAUNDERS,**

    **Plaintiff,**

                              Civil Action 2:15-cv-2758
    v.                              Magistrate Judge Elizabeth P. Deavers

**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

**OPINION AND ORDER**

Plaintiff, Cheryl Denise Saunders ("Plaintiff"), brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for supplemental security income. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 14), the Commissioner's Memorandum in Opposition (ECF No. 20), and the administrative record (ECF No. 13). For the reasons that follow the Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner's decision.

**I.    BACKGROUND**

Plaintiff filed her applications for benefits in June 2011, alleging that she has been disabled since September 1, 2010, due to pins in her left hip, paraformis syndrome, fibromyalgia, depression, arthritis in both knees, sciatica, hypertension, and osteoarthritis. (R. at 209-15, 216-23, 244.) Plaintiff's applications were denied initially and upon reconsideration. Plaintiff sought a *de novo* hearing before an administrative law judge. Administrative Law Judge Larry A. Temin ("ALJ") held a video hearing on December 4, 2013, at which Plaintiff, represented by counsel, appeared and testified. (R. at 34-63.) Howard L. Caston, a vocational expert, also

appeared and testified at the hearing. (R. at 64–74.) On February 27, 2014, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 7-24.) On June 25, 2015, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1-5.) Plaintiff then timely commenced the instant action.

## II. HEARING TESTIMONY
### A. Plaintiff's Testimony

Plaintiff testified at the administrative hearing that she last worked in September 2010. (R. at 37.) At that point, she was only working between 16-28 hours per week as an insurance clerk. (R. at 38.) She testified that her last job ended for two reasons, the first was she was "sitting all day long" which caused problems coming into work late and the other was having to take her special needs son to his doctor appointments. (R. at 39.)

Plaintiff testified that she is unable to work due to insomnia; hip pain; low back pain; anxiety; and depression. (R. at 42-43.) She testified that she only sleeps three to four hours per night due to hip pain. (R. at 42.)

Plaintiff testified that she has difficulty lifting; if she lifts too much, pain runs down her left leg and in the middle of her back. (R. at 47.) Plaintiff estimated that she can lift up to ten pounds. (R. at 48.) She can only stand for thirty minutes and "maybe" walk about a block and a half. (*Id.*) Plaintiff estimated that she can sit for one hour before she needs to walk. (*Id.*) Plaintiff testified that she can bend forward; she can reach up and out; and she has difficulty climbing stairs. (R. at 49.)

Plaintiff described her energy level as low. (R. at 51.) She acknowledged smoking a half a pack of cigarettes a day. (R. at 52.) During a typical day, she watches television; visits her mother; drives a little; reads a little; and tends to her personal grooming. (R. at 52.) She also

2

stated that she likes to draw. (R. at 50.) Her 23 year old son takes care of household chores, and grocery shopping, while her 18 year old son helps to lift/take care of his special needs younger brother. (R. at 54-55.)

### B. Vocational Expert Testimony

The vocational expert ("VE") testified at the administrative hearing that Plaintiff's past relevant employment was as an insurance clerk, classified as a sedentary exertional job, semi-skilled level; a therapeutic program worker, which the VE classified as nursing according to the Dictionary of Occupational Titles ("DOT"), a medium exertion, semi-skilled job; and accounts receivable, a sedentary exertion, skilled job. (R. at 65-67.)

The ALJ proposed a hypothetical question to the VE regarding a person of Plaintiff's age, education and work history:

> [The hypothetical person] can lift, carry, push and pull up to 20 pounds occasionally, 10 pounds frequently. Can stand and/or walk for six hours in an eight hour workday. Can sit for six hours in an eight hour workday with normal work breaks. No more than occasional stooping, kneeling, crouching , or climbing of ramps and stairs. No crawling, climbing of ladders, ropes, or scaffolds, or working at unprotected heights or hazardous machinery. The individual is limited to simple, routine, repetitive tasks, and to remembering and carrying out only short, simple instructions. The jobs should not require more than superficial interaction with the general public, coworkers, and supervisors. The job should not require an inflexible work pace. And no more than ordinary, routine changes in the work setting.

(R. at 67-68.)

Based on the above hypothetical, the VE testified that Plaintiff could not perform her past relevant work but was capable of performing representative occupations such as an office helper, with 70 jobs in the regional economy and 76,830 jobs in the national economy; a cleaner or maid, with 970 jobs regionally and 894,920 jobs in the national economy; and a routing clerk, with 800 jobs available regionally and 687,940 jobs in the national economy. (R. at 69-70.)

### III. MEDICAL RECORDS

The record shows that Plaintiff was in a motor vehicle accident twenty years prior to filing for disability benefits. She subsequently underwent surgery with hardware implantation of pins in her left hip and a rod in her right femur; the rod was subsequently removed. Plaintiff also is noted to have a residual sciatic nerve injury that resulted from a traumatic hip dislocation on the left. (R. at 56-58, 370, 438.)

**A.     Holzer Clinic**

The earliest treatment record in the administrative record is dated September 20, 2010, where Plaintiff treated with family practice physician, Adam Breinig, D.O. (R. at 321-22.) At that time, Dr. Breinig continued Plaintiff's Hydrocodone-acetaminophen. (*Id.*)

When seen for follow-up on October 1, 2010, Plaintiff exhibited 2+ deep tendon reflexes bilaterally; full range of motion of all extremities as appropriate for her chronic pain; and a normal gait. (R. at 330-32.) Plaintiff entered into a Chronic Pain Management Agreement with Dr. Breinig. (R. at 327-29.)

Plaintiff saw Steven Merkel, M.D. in July 2011. (R. at 352-54.) Plaintiff continued to complain of some generalized neck pain as well as pain along the paraspinal muscles of the entire spine. (R. at 352.) On examination, Dr. Merkel found some muscle wasting in the right quadriceps area and pain with flexion and extension of the right knee, but no cyanosis, clubbing or edema. Dr. Merkel also noted some tenderness to palpation in her neck and lumbar spine. (R. at 353.) Dr. Merkel added Flexeril and adjusted Plaintiff's medications. (R. at 354.)

A left hip x-ray, taken on February 23, 2012, showed mild early degenerative changes at the inferior aspects of the SI joints, slightly more prominent on the right. (R. at 359.) When seen by Dr. Merkel on February 27, 2012, he found tenderness with rotation of the hips and with

4

palpation over the left hip and straight leg raising positive for mild increase in back pain at 70° bilaterally.  (R. at 356.)

X-rays taken of Plaintiff's right hip on February 12, 2013, showed minimal degenerative changes.  (R. at 399.)  Right knee x-rays taken that same day showed chondromalacia patella with mild degenerative changes.  (R. at 401.)

Christopher T. Marazoh, M.D., saw Plaintiff on March 28, 2012, for follow-up of fibromyalgia.  Plaintiff felt her fibromyalgia was worse and her pain was "significantly uncontrolled."  Dr. Marazoh noted she failed her drug test and "would need to monitor her more closely in order to intimate opioid medication."  On examination, Plaintiff has some tenderness to palpation over the lumbar spine and thoracic spine.  For Plaintiff's osteoarthritis and fibromyalgia, Dr. Marazoh continued the baclofen and Neurontin and restarted hydrocodone.  For her chronic pain, Dr. Marazoh noted she does have a pain contract, and he considered the initial urinalysis a failure with the Tramadol.  She did fail to disclose usage of that.  Dr. Marazoh felt that it was an honest mistake.  She did not think that Tramadol was a opioid-type medication.  She thought it was more along the lines of a nonsteroidal like Motrin.  She has not been off hydrocodone for more than a week.  Dr. Marazoh was going to closely monitor her urinalysis.  (R. at 389-91.)

Plaintiff saw Jeremy Parsons, D.O. in August 2013, complaining of left lower leg, ankle, and foot swelling, worse at night.  On examination, Dr. Parsons found mild swelling to lower extremity, diminished pedal pulses, and her left foot was cooler than the right.  She exhibited no joint instability or range of motion deficit of the foot or ankle, and no sensory or motor deficits.  (R. at 381-84.)

### B. BC Family Practice

In August 2012, Plaintiff was seen by Jeanne Ingles, FNP, reporting that she was experiencing a lot of pain in her hips due to being in a car accident 21 years prior resulting in surgery and pins in her hips. Plaintiff denied any numbness, tingling, or swelling. (R. at 364.) On examination, her gait was normal, and she was able to move all of her extremities without difficulty. (R. at 365.) Ms. Ingles prescribed Robaxin, diclofenac sodium topical gel, and Tramadol. (*Id.*)

In February 2013, Plaintiff complained of left hip pain with some diminished range of motion, but denied any numbness, tingling, or swelling. Ms. Ingles noted decreased range of motion of Plaintiff's left hip on examination. (R. at 363.)

In March 2013, Plaintiff reported that she had not seen her primary care physician but had an appointment the following month. She needed refills of her medication and was experiencing "chronic pain." Ms. Ingles found no joint deformity, no joint swelling and no leg edema on examination. (R. at 362.)

### C. Thomas Emmer, M.D./Tigran Garabekyan, M.D.

Plaintiff consulted with orthopedic surgeons, Dr. Emmer and Dr. Garabekyan, in July 2013, for bilateral hip pain, left worse than right. (R. at 370.) Plaintiff told Dr. Emmer that she was not working because she is at home taking care of a special needs child. On examination, Dr. Emmer found tenderness to palpation and pain with range of motion, although it was not severe. Plaintiff's sensation and motor skills were intact. Plaintiff exhibited pain with anterior impingement testing, as well as FABER testing. X-ray imaging showed moderate arthritic changes with well-preserved bilateral joint spaces and left sided joint space narrowing of the hip joint. (R. at 371.) However, her surgical hardware appeared to be in place, with no signs of

6

loosening and no fractures or dislocations.  (*Id.*)  Treatment options were discussed and Plaintiff was given an intra-articular steroid injection into her left hip.  Due to her neurologic symptoms, Plaintiff was referred to neurosurgeon, Dr. Mazagri.  (R. at 372.)

**D.    Rida Mazagri, M.D.**

On October 15, 2013, Plaintiff consulted with neurosurgeon, Dr. Mazagri, with complaints of low back pain with radiation to the thigh.  On examination, Plaintiff had a normal gait, normal heel and toe walking, good coordination, and a normal muscle exam with no spasticity.  (R. at 412.)  There was no tenderness or pain with palpation; normal flexion, extension, and lateral bending of the spine; negative straight leg raise testing bilaterally; and normal sensation in all four extremities.  (R. at 412-13.)  Dr. Mazagri assessed lower back pain with radiation to the side of the thigh to the mid thigh, "[M]ost probably related to lumbar spondylosis."  (R. at 413.)  She ordered steroids and physical therapy.  (*Id.*)

**E.    Robert Hess, M.D.**

Plaintiff initially treated with another physician in Dr. Hess's office in April 2013 to establish as a patient.  At that time, she was assessed with hypertension, osteoarthritis, myalgia and myositis and depression.  (R. at 451-54.)

Plaintiff first saw Dr. Hess in July 2013.  (R. at 447-50.)  Plaintiff reported some muscle pain and joint stiffness in her hips from a motor vehicle accident 22 years earlier, but no sleep disturbance, no malaise, and no sensory disturbances.  (R. at 448.)  On examination, Plaintiff exhibited  a normal back, normal gait and stance, and normal reflexes.  (R. at 449.)  Plaintiff was prescribed Lortab and referred to an orthopedist regarding the rod in her hip from an earlier car accident.  (R. at 450.)

On October 8, 2013, Plaintiff reported muscle pain and joint stiffness, and anxiety related to her 7-year old special needs son who required total care. (R. at 444.) Plaintiff was not in acute distress, and examination revealed normal back, normal gait and stance, and normal reflexes. (R. at 445.)

On November 19, 2013, Dr. Hess opined that Plaintiff's subjective complaints of pain and fatigue are consistent with his objective findings. Dr. Hess also opined that Plaintiff is unable to engage in employment for 8 hours a day, 5 days a week on a consistent basis. (R. at 433-34.)

Plaintiff saw Dr. Hess for follow-up of her depressive disorder, hypertension, lumbago, myalgia and myositis, osteoarthritis, and refills on medication on November 26, 2013. Plaintiff reported she was suffering from some muscle pain and joint stiffness, but no sleep disturbance, no malaise, no sensory disturbances, and that she was still smoking. (R. at 438-39.) On examination, Dr. Hess found a normal back, normal gait and stance, and normal reflexes. (R. at 440.) Plaintiff was counseled for smoking cessation and was prescribed Lortab. (R. at 442.)

That same day, Dr. Hess completed a functional capacity form in which he opined that Plaintiff can lift up to 30 pounds; stand/walk for 1 hour out of an 8 hour workday and sit only 4 hours out of an 8 hour workday; and never crawl, kneel, crouch, or climb, and occasionally balance or stoop. (R. at 435-36.) Dr. Hess also found limitations in reaching, pushing, and pulling. (R. at 437.)

### F. State Agency Evaluation

On December 5, 2011, state agency physician, Teresita Cruz, M.D., reviewed the record and assessed Plaintiff's physical functioning capacity. (R. at 79-87.) Dr. Cruz opined that Plaintiff could frequently lift up to 25 pounds, and occasionally lift up to 50 pounds; stand, walk

8

and/or sit for about 6 hours in an 8-hour workday.  (R. at 86.)  Dr. Cruz opined that Plaintiff could only occasionally kneel, crouch, and climb of ladders, ropes or scaffolds.  (R. at 87.)

James Cacchillo, D.O. reviewed Plaintiff's records upon reconsideration on June 17, 2012, and affirmed Dr. Cruz's assessment.  (R. at 105-13.)

## IV.  THE ADMINISTRATIVE DECISION

On February 27, 2014, the ALJ issued his decision.  (R. at 7-24.)  The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through March 31, 2015.  (R. at 12.)  At step one of the sequential evaluation process,[1] the ALJ found that Plaintiff had not engaged in substantially gainful activity since September 1, 2010, the alleged onset date.  (*Id.*)  The ALJ found that Plaintiff had the severe impairments of status post remote motor vehicle accident with right femur fracture, left posterior hip dislocation, acetabular fracture and clavicle fracture; bilateral hip osteoarthritis/femoral aetabular impingement; left trochanter bursitis; myalgia/myositis/neuritis/sciatic neuralgia/lumbago; right knee degenerative changes; a mood disorder; and post-traumatic stress disorder.  (*Id.*)  The ALJ also found that Plaintiff's hypertension, allergic rhinitis, sinusitis, anemia, esophageal reflux, restless leg syndrome, a

---

[1] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §416.920(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

breast disorders; and amenorrhea are not severe impairments because the evidence reflects that her symptoms generally resolved with medications and treatment from her primary care physician; her left knee pain is not considered severe because Plaintiff denied any treatment or complaints of knee pain; her physical examination was revealed normal findings; and the record does not contain a significant history of complaints of left knee pain; and while Plaintiff has been diagnosed with fibromyalgia, the totality of the medical evidence of record indicates that this diagnosis does not meet the criteria set forth by the Social Security Administration for such diagnosis. (R. at 13-14.) He further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 14.) At step four of the sequential process, the ALJ evaluated Plaintiff's residual functional capacity ("RFC"). The ALJ found:

> After careful consideration of the entire record, the [ALJ] finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). Specifically, the claimant can perform work activity except as follows: The claimant can lift/carry/push/pull up to 20 pounds occasionally and 10 pounds frequently. She can stand and/or walk for up to six hours out of an eight-hour workday, and she can sit for up to six hours out of an eight-hour workday. The claimant can only occasionally stoop, kneel, crouch, and climb ramps or stairs. She can never crawl, climb ladders/ropes/scaffolds, or work at unprotected heights or around hazardous machinery. The claimant is able to perform only simple, routine, repetitive tasks. The claimant is able to remember and carry out only short and simple instructions. Her job should not require more than superficial interaction with the general public, coworkers, or supervisors. The claimant's job should not require an inflexible work pace or more than ordinary and routine changes in work setting or duties.

(R. at 15-16.) In reaching this determination, the ALJ accorded "some weight" to the opinions of the state agency reviewing physicians, Dr. Cruz and Dr. Cacchillo, noting that their assessments are generally consistent with and supported by the objective physical examination findings of record; however, there was new medical evidence received after their determination, and

10

the record as a whole supports limiting Plaintiff to less than the full range of light exertional level. (R. at 21.) The ALJ assigned "little weight" to the opinion of Plaintiff's treating physician, Dr. Hess, because his opinion was inconsistent with the medical evidence of record and with his own treatment notes, finding an individual disabled is an issue reserved to the Commissioner, and Plaintiff only saw Dr. Hess three times before the date of the assessment. (R. at 21-22.)

Relying on the VE's testimony, the ALJ determined that even though she is unable to perform her past relevant work there are jobs exist in the national economy that Plaintiff can perform. (R. at 22-24.) He therefore concluded that Plaintiff was not disabled under the Social Security Act. (R. at 29.)

## II. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

11

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.  LEGAL ANALYSIS

Plaintiff raises a single challenge to the ALJ's decision.  Specifically, she contends that the ALJ committed reversible error in failing to accord greater deference to the opinion of her treating physician, Dr. Hess, concerning her physical limitations.  The Court disagrees and concludes that substantial evidence supports the ALJ's decision.

### A. Treating Physician's Opinion

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case.  20 C.F.R. § 416.927(d).  The applicable regulations define medical opinions as "statements from physicians . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence

12

that cannot be obtained from the objective medical findings alone . . . ." 20 C.F.R. § 416.927(d)(2); *Blakley*, 581 F.3d at 408. If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(d)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id.*
Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 416.927(d)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *7 (6th Cir. 2010) (internal quotation omitted). The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

13

*Wilson*, 378 F.3d at 544–45. Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 312 F. A'ppx 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(e). Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance. 20 C.F.R. § 404.1527(e); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

**B.     Application**

The ALJ did not err in according little weight to the opinion of Plaintiff's treating physician, Dr. Hess with respect to his analysis of Plaintiff's physical impairments. Specifically, the ALJ properly considered the *Wilson* factors in concluding that Dr. Hess' opinion was entitled to little weight. 378 F.3d at 544. First, the ALJ noted that Plaintiff does not have a significant treatment relationship with Dr. Hess, as the latter had only started treating the Plaintiff on July 2, 2013. Moreover, Dr. Hess had only seen Plaintiff three times before the date of the assessment, on July 2, 2013, on October 8, 2013, and on November 26, 2013. (R. at 21.) Thus, the ALJ properly discounted Dr. Hess' opinion because he did not have a significant treating relationship with Plaintiff. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 506-507 ("Indeed, depending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship.") (6th Cir. 2006).

Second, the ALJ properly found that Dr. Hess' opinion is not consistent with, or supported by, substantial medical evidence in the record. This includes Dr. Hess' own treatment notes, which reflect that Plaintiff does not suffer from motor or sensatory disturbances; is not in

14

acute distress; has normal gait and stance; has normal deep tendon reflexes; and no costovertebral angle tenderness. (*Id*.) In addition to Dr. Hess' treatment notes, the ALJ thoroughly examined the medical record as a whole. The ALJ noted that Plaintiff's visits with physicians did not demonstrate symptoms from her pain "typically associated with chronic, severe pain, such as muscle atrophy, spasm, rigidity, or tremor." (R. at 18.) In addition, Plaintiff had conservatively treated for her pain with medications and has not undergone additional invasive treatment such as surgery. (*Id*.) The ALJ combed through Plaintiff's physical examinations in making the aforementioned determinations. Substantial evidence, including notes from October 2010, July 2011, January 2012, August 2012, February 2013, March 2013, and July-November 2013 examinations, support the ALJ's conclusion. None of the examinations revealed the type of aforementioned debilitating pain which would comport with Dr. Hess' analysis. (R. at 18-19.)

  Moreover, the ALJ noted, Plaintiff is able to perform a wide range of activities of daily living, which is not consistent with a disability determination. The ALJ's determinations in this regard are well-supported by the evidence. For example, Plaintiff executes her personal care without any assistance; takes care of her special needs child; has a close friend she visits weekly; performs light household chores with frequent breaks; does not need help or reminders to take care of her grooming or to take medicine; prepares meals at home; takes excursions for shopping in her car monthly; is able to manage money; and handles changes in routine well. (R. at 20.) The ALJ properly found that Plaintiff's activities of daily living were inconsistent with a significant disability. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) (ALJ may consider claimant's daily living activities in evaluating credibility).

15

Finally, the ALJ highlighted that the record suggests Plaintiff is not working for reasons other than the allegedly disabling impairment, for example caring for her special needs son and for her mother. (R. at 21.) This assertion is amply supported in the record.

Plaintiff's contrary arguments on this point are not well-taken. Plaintiff points to several notes from physician visits as demonstrative that Dr. Hess' opinion is supported by and consistent with the medical evidence of record. However, nearly all of the pieces of the record to which Plaintiff points reflect "mild" or "moderate" ailments—for example, "mild early degenerative changes at the inferior aspects of the SI joints" (R. at 359); "moderate arthritic changes of the bilateral hips" (R. at 373); "mild swelling to lower extremity" (R. at 384); "minimal degenerative changes in the right hip" (R. at 399-400); "mild degenerative changes of the right knee" (R. at 401); and "mild tenderness to palpation about the anterior groin of the left hip" (R. at 419). The remaining portions of the record Plaintiff proffers include diagnoses of "some tenderness with rotation of the hips and with palpation over the left hip" with "mild increase in back pain" (R. 356); "some tenderness to palpation over the lumbar spine as well as her thoracic spine" (R. at 390); and "lower back pain" likely "related to lumbar spondylosis" (R. 413). These treatment notes are not consistent with debilitating pain constituting a disability, and the ALJ was justified in his determination to discount Dr. Hess' opinion. *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 391 (6th Cir. 2004) (proper to reject physician's conclusion where inconsistent with substantial evidence in the record indicating otherwise).

Accordingly, the Undersigned concludes that the ALJ did not err in failing to accord greater deference to the medical statement of Dr. Hess. Furthermore, substantial evidence supports the ALJ's decision.

## V. CONCLUSION

In sum, from a review of the record as a whole, the Court concludes that substantial evidence supports the ALJ's decision denying benefits. Accordingly, the Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner of Social Security's decision. The Clerk is **DIRECTED** to enter judgment in favor of Defendant.

**IT IS SO ORDERED.**


Date: September 6, 2016                          /s/ *Elizabeth A. Preston Deavers*
                                                ELIZABETH A. PRESTON DEAVERS
                                                UNITED STATES MAGISTRATE JUDGE